ORIGINAL

Approved: _____
Rushmi Bhaskaran / Mitzi Steiner
Assistant United States Attorneys

Before:   HONORABLE SARAH NETBURN
          United States Magistrate Judge      **22 MAG 2163**
          Southern District of New York

------------------------------------- X

UNITED STATES OF AMERICA,                : **SEALED COMPLAINT**
                                         :
         - v. -                          : Violations of
                                         : 18 U.S.C. §§ 1956(h),
WILSSON RAFAEL VAZQUEZ HILDAGO,          : and 2; 21 U.S.C. § 846
                                         :
                                         : COUNTY OF OFFENSE:
          Defendant.                     : BRONX
                                         :
------------------------------------- X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       JOSEPH SCHLEE, being duly sworn, deposes, and says that he is a Special Agent with the United States Drug Enforcement Administration, and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Money Laundering)

       1.   From at least in or about July 2020, up to and including in or about January 2022, in the Southern District of New York and elsewhere, WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to violate the money laundering laws of the United States.

       2.   It was a part and an object of the conspiracy that WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, felonious narcotics offenses in violation of Title 21, United States Code, Sections 841 and 846, knowing that the transaction was designed, in whole and in

part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

3. It was further a part and an object of the conspiracy that WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## COUNT TWO
(Narcotics Conspiracy)

4. From at least in or about January 2022, up to and including in or about February 2022, in the Southern District of New York and elsewhere, WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

5. It was a part and an object of the conspiracy that WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

6. The controlled substance that WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, conspired to distribute and possess with intent to distribute was 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7. I am a Special Agent with the DEA and serve on a strike force with the Department of Homeland Security. I have been personally involved in the investigation of this matter. The information contained herein is based upon my own observations,

conversations with other law enforcement agents and others, and my examination of bank records, reports, and records prepared by others. Because this complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview of the Scheme

8. Based on my involvement in this investigation, I have learned that WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, assists in the operation of a money remitting business named Jimenez Multi-Services, Inc. ("JMS"), located in the Bronx. JMS is managed by VAZQUEZ HILDAGO's partner, CC-1. As discussed in more detail herein, I have further learned that VAZQUEZ HILDAGO assists CC-1 in laundering narcotics proceeds through JMS, and further, that VAZQUEZ HILDAGO traffics fentanyl, with CC-1's assistance.

### The Money Laundering Conspiracy

9. Law enforcement has conducted several controlled money laundering transactions with CC-1, who at times, was assisted by WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant. To conduct these transactions, law enforcement used a confidential source ("CS-1"),[1] who was introduced to CC-1 through a Mexican-based narcotics trafficker ("CC-2").[2]

---

[1] In or about April 2020, CS-1 was arrested in connection with a federal narcotics offense. Specifically, CS-1 was caught attempting to distribute approximately ten kilograms of heroin. Since that arrest, CS-1 has provided information to law enforcement in hopes of obtaining leniency and immigration benefits. CS-1's information has been deemed reliable and has been corroborated by other evidence. In or about December 2012, CS-1 was convicted of a state narcotics offense.

[2] In approximately 2008, CC-2 was arrested for drug trafficking and related offenses and deported from the United States in 2013. According to CS-1, based on his interactions with CC-2, CS-1 knows, in substance and in part, that after CC-2 was deported, CC-2 moved to Calican, Mexico, where CC-2 became a high-ranking member of the Sinaloa drug-trafficking cartel.

10. Based on my participation in this investigation, my review of law enforcement records and reports, my conversations with other law enforcement officers, debriefs with CS-1,[3] my review of recorded phone calls and text messages, and my surveillance, I aware of the following controlled money laundering transactions:

*The July 17, 2020 Transaction*

a. On or about July 16, 2020, CC-2 made a WhatsApp call to CS-1, and asked CS-1, in substance and in part, to pick up proceeds from an unknown individual ("FNU LNU-1"). CS-1 understood that the proceeds were narcotics related based on CS-1's prior distribution of heroin for CC-2. CS-1, acting under law enforcement's direction, picked up the proceeds, which totaled $20,000, from FNU LNU-1 on or about July 16, 2020.

b. On or about July 17, 2020, CC-2 made a WhatsApp phone call to CS-1. CC-2 told CS-1, in substance and in part, to drop off the proceeds that CS-1 had received on July 16, 2020 at 2151 Jerome Avenue in the Bronx, the address for JMS, and ask for an individual with the same first name as CC-1. CC-2 further informed CS-1, in substance and in part, that CS-1 should use the phrase "on behalf of my brother-in-law," and CC-1 would know what to do.

c. Later that day at approximately 2:45 p.m., CS-1 entered JMS with a bag containing the $20,000 in narcotics proceeds, while law enforcement established surveillance outside JMS. CS-1 informed law enforcement, in substance and in part, that once inside JMS, CS-1 approached a woman, later identified as CC-1, standing behind a counter and told her, "on behalf of my brother-in-law," while showing her the bag containing the narcotics proceeds. Based on my training and experience, as well as my involvement in this investigation, I believe that CC-1 understood "on behalf of my brother-in-law" to mean CC-2, and that CC-1 understood that CS-1 was acting at CC-2's direction. Thereafter, CC-1 directed CS-1 to an office ("Office-1") located

---

According to CS-1, from there, CC-2 distributes approximately 20 to 30 kilograms of heroin to the Northeast, including New York, New Jersey, and Philadelphia, each month. In addition, according to CS-1, CC-2 assists the Sinaloa Cartel with laundering drug proceeds.

[3]   Except where noted otherwise, CS-1's phone calls, text messages, and meetings with CC-1 and CC-1 were recorded.

4

at the back of JMS, where she took the proceeds and counted them with a money counter.

d. At approximately 3:04 p.m., a law enforcement officer ("Officer-1") briefly entered JMS, while CS-1 appeared to be in Office-1. While CS-1 was in Office-1, CS-1 overheard two other men present inside JMS state, in substance and in part, that something "strange" was happening. Some minutes after Officer-1 left JMS, law enforcement observed an unidentified male ("FNU LNU-2") walk outside JMS and appear to be looking for someone. Based on my training and experience, law enforcement believes that FNU LNU-2 may have been looking for Officer-1, and that FNU LNU-2 was suspicious of Officer-1 when Officer-1 entered JMS when CS-1 was in Office-1.

### The January 7, 2021 Transaction

e. On or about January 7, 2021, CC-2 communicated with CS-1 by WhatsApp. CC-2 told CS-1, in substance and in part, to pick up $100,000 from his sister-in-law, *i.e.*, CC-1. At approximately 3 p.m. that day, CS-1 called CC-1.[4] CC-1 told CS-1, in substance and in part, that CC-1 was in "Santo Domingo," but that CS-1 should contact VAZQUEZ HILDAGO. CC-1 provided CS-1 with VAZQUEZ HILDAGO's phone number over WhatsApp.

f. On or about January 7, 2021, at approximately 3:10 p.m., CS-1 called VAZQUEZ HILDAGO. VAZQUEZ HILDAGO told CS-1, in substance and in part, to meet VAZQUEZ HILDAGO at 2151 Jerome Avenue in the Bronx, New York., *i.e.*, the address of JMS. At approximately 4:15 p.m. on January 7, 2021, law enforcement set up surveillance outside JMS, and saw that the front security gate was pulled down. At approximately 4:50 p.m., law enforcement saw VAZQUEZ HILDAGO open the gate and front door of JMS. Shortly thereafter, VAZQUEZ HILDAGO called CS-1 and told CS-1, in substance and in part, that VAZQUEZ HILDAGO had arrived at the meeting location. At approximately 5:00 p.m., law enforcement saw CS-1 enter JMS, and then exit at approximately 5:45 carrying a purple bag ("Bag-1"). At a debriefing session shortly thereafter, law enforcement searched Bag-1 and found approximately $100,000. CS-1 informed law enforcement, in substance and in part, that CS-1 received Bag-1 from VAZQUEZ HILDAGO.[5]

---

[4] All phone communications described herein between CS-1 and CC-1 were made to a phone number ending in -8133. The 8133 number is subscribed to in the name of CC-1.

[5] At CC-2's direction, CS-1 provided these proceeds to

5

### The January 26, 2021 Transaction

g. On or about January 25, 2021, CC-2 contacted CS-1 by WhatsApp and asked CS-1 to pick up money from CC-1. At approximately 4:00 p.m., CS-1 contacted CC-1. During that discussion, CC-1 asked CS-1, in substance and in part, whether CS-1 was a "cousin" of her brother-in-law (i.e., CC-2). CS-1 responded that CS-1 was. CC-1 told CS-1, in substance and in part, that her "brother-in-law" (i.e., CC-2) told CC-1 that CS-1 would be contacting CC-1. CC-1 informed CS-1 that she told her brother-in-law that she had "it" in the house. Based on my training and experience, as well as my involvement in this investigation, I believe that CC-1 was confirming how CS-1 was related to CC-2, and that "it" referred to bulk currency which CC-2 wished to launder through CC-1.

h. Later that day, CC-1 sent a text message to CS-1 with the address, "754 East 161st Street, Bronx, New York" (the "Apartment Building"), which based on surveillance and database searches, law enforcement understands is an apartment building where CC-1 lives with VAZQUEZ HILDAGO. At approximately 5:58 p.m., CS-1 sent a text message to CC-1, informing CC-1, in substance and in part, that CS-1 was waiting outside the Apartment Building. Law enforcement then observed CC-1 exit the Apartment Building with a black bag ("Bag-2"), which CC-1 placed in CS-1's vehicle. CS-1 informed law enforcement that CC-1, upon placing Bag-2 in CS-1's vehicle, told CS-1, in substance and in part, that Bag-2 contained "50 flat."[6] Based on my training and experience, as well as my involvement in this investigation, I believe that CC-1 conveyed to CS-1 that Bag-2 contained $50,000 ("50 flat"). Law enforcement thereafter searched Bag-2 and found that it contained $50,000.[7]

### The March 29, 2021 Transaction

i. On or about March 29, 2021, CC-2 contacted CS-1 using WhatsApp and told CS-1, in substance and in part, to transfer $2,500 in narcotics proceeds to CC-1. Later on March 29,

---

another co-conspirator.

[6] This conversation was not recorded.

[7] CC-2 instructed CS-1 to provide the money in Bag-2 to an unknown individual, which CS-1 did later that day under law enforcement's supervision.

2021, at approximately 1:05 p.m., CS-1 spoke to CC-1. During the call, CS-1 and CC-1 stated the following:

**CS-1:** Hello.

**CC-1:** How are you?

**CS-1:** Are you going to be in the office today?

**CC-1:** Yes, in about 30 min.

**CS-1:** You gonna be there until 5?

**CC-1:** Yes.

**CS-1:** I'm gonna call you I need to stop by and drop off some Guandules.

**CC-1:** Okay very good.

Based on my training and experience, as well as my involvement in this investigation, I believe CC-1 told CS-1 that CC-1 would be available until 5 p.m. that evening to conduct a money laundering transaction. Further, I believe, based on my training and experience, that "Guandules," which means a green-colored bean, is a code word for illegally-obtained money, and that when CC-1 acknowledged CS-1's request to drop off some "Guandules," CC-1 understood that the money was obtained through illicit means.

   j. At approximately 4:30 p.m. that day, CS-1 entered JMS with the narcotics proceeds. Once inside, CS-1 went into Office-1, where CS-1 met CC-1. CC-1 who took the proceeds and put them in a drawer in Office-1.

<u>The DEA's Controlled Money Laundering Transactions with CC-1 and VAZQUEZ HILDAGO</u>

   k. On or about November 9, 2021, CS-1 met with CC-1 at JMS. CS-1 told CC-1, in substance and in part, that CS-1 and CS-1's associates needed assistance moving money that CS-1 acquired through selling "materials," *i.e.,* a common code word used for narcotics. CC-1 agreed to do so. CC-1 further stated, in substance and in part, that CC-1 could use CC-1's business, *i.e.,* JMS, to move between $10,000 to $12,000 each day, or up to $80,000 per week. CC-1 further stated, in substance and in part, that CC-1 charges a seven to eight percent commission, depending

7

on whether CS-1 could procure names and phones numbers to use on remission slips. After CS-1 informed CC-1 that the money needed to be transferred to Santo Domingo in the Dominican Republic, CC-1 told CS-1, in substance and in part, that CC-1 would charge CS-1 eight percent to transfer the proceeds to the Dominican Republic.

   l. On or about December 21, 2021, CS-1 met with CC-1 at JMS. CS-1 provided CC-1 with $35,000, which CC-1 counted with a money counter. After removing eight percent of the funds and placing them in CC-1's drawer, CC-1 directed CS-1 to call CS-1's counterpart in the Dominican Republic. CS-1 called an undercover officer located in Santo Domingo ("UC-1"). CC-1 told UC-1 and CS-1 that, in light of the upcoming holidays, it would take CC-1 several days to transfer the funds to Santo Domingo. UC-1 further provided CC-1 with UC-1's contact information so that CC-1's counterpart in the Dominican Republic arrange to provide UC-1 with the funds.

   m. On or about December 27, 2021, UC-1 met with an individual ("CC-3") in Santo Domingo, Dominican Republic. CC-3 entered UC-1's car and gave UC-1 $32,200—that is, the $35,000 that CS-1 gave CC-1 on December 21, 2021, minus CC-1's eight percent commission.

   n. On or about January 5, 2022, CS-1 met with CC-1 and VAZQUEZ HILDAGO at JMS. CS-1 provided CC-1 with $40,000, which CC-1 counted with a money counter. CC-1 removed eight percent of the funds and placed it in CC-1's drawer. CC-1 told CS-1, in substance and in part, that that the money would be available in Santo Domingo by January 11, 2022.

   o. On or about January 12, 2022, UC-1 again met with CC-3 in Santo Domingo, Dominican Republic. CC-3 gave UC-1 $36,800 in bulk currency—that is, the $40,000 that CS-1 gave CC-1 and HLIDAGO VAZQUEZ on January 5, 2022, minus CC-1's eight percent commission.

### The Fentanyl Distribution Conspiracy

   p. On or about January 25, 2022, CC-1 and CS-1 met at JMS's new office on Grand Concourse Boulevard in the Bronx ("JMS Office-2"). CC-1 asked CS-1 when CS-1 would have more money for CC-1 to transfer. CS-1 told CC-1, in substance and in part, that CS-1 had ran out of "product"—a word, based on my training and experience, that is commonly used to describe narcotics. CS-1 asked CC-1 whether CC-1 knew anyone who could help CS-1 obtain

8

additional product. In response, CC-1 told CS-1, in substance and in part, that while CC-1 did not distribute narcotics, VAZQUEZ HILDAGO could help CS-1 obtain more product.

q. On or about January 25, 2022, CS-1 met with VAZQUEZ HILDAGO at JMS Office-2. VAZQUEZ HILDAGO told CS-1 that VAZQUEZ HILDAGO had three kilograms of fentanyl that VAZQUEZ HILDAGO could sell to CS-1 immediately. VAZQUEZ HILDAGO further told CS-1, in substance and in part, that VAZQUEZ HILDAGO receives 10 to 15 kilograms of fentanyl each week from Mexico. CS-1 told VAZQUEZ HILDAGO, in substance and in part, that CS-1 would speak to CS-1's associate before agreeing to a transaction. VAZQUEZ HILDAGO also provided CS-1 with CC-1's phone number.

r. On or about January 27, 2022, CS-1 and VAZQUEZ HILDAGO spoke by phone. CS-1 asked VAZQUEZ HILDAGO for a sample of the fentanyl. VAZQUEZ HILDAGO told CS-1, in substance and in part, that VAZQUEZ HILDAGO did not like to "cut into the product," but that CS-1 could take a kilogram of the fentanyl on consignment, and if CS-1 did not like it, CS-1 could return it. Later that day, CS-1 texted VAZQUEZ HILDAGO and asked VAZQUEZ HILDAGO where CS-1 should meet VAZQUEZ HILDAGO to pick up the fentanyl. In response VAZQUEZ HILDAGO texted, in substance and in part, that VAZQUEZ HILDAGO was not in town, but that CS-1 could go by the Apartment Building to pick up the fentanyl from CC-1.

s. Later that day, law enforcement set up surveillance within and outside of the Apartment Building. Agents saw CC-1 exit her apartment holding an open, paper gift bag ("Bag-4") and deliver it to CS-1 outside of the Apartment Building. After CS-1 received Bag-4, law enforcement searched it and found a white brick, wrapped in clear plastic, of apparent narcotics. That brick weighed approximately one kilogram and tested positive for fentanyl.

t. On or about February 7, 2022, CS-1 met with VAZQUEZ HILDAGO nearby the Apartment Building. Once VAZQUEZ HILDAGO and CS-1 were together, CS-1 called CS-1's associate, another confidential source ("CS-2")[8] working for the DEA. CS-2 posed as CS-1's boss. VAZQUEZ HILDAGO told CS-2 and CS-1, in

---

[8] CS-2 has previously been convicted three times for state and federal narcotics offenses. For the past ten years, CS-2 has worked for the DEA for financial compensation. CS-2's information has led to numerous seizures of narcotics and narcotics proceeds. CS-2's information has been deemed reliable and has been corroborated by other evidence.

substance and in part, that he could sell them ten kilograms of fentanyl in the coming weeks.

u. On or about February 16, 2022, VAZQUEZ HILDAGO was arrested in connection with a separate fentanyl transaction involving approximately seven kilograms of fentanyl. VAZQUEZ HILDAGO was charged by the Bronx District Attorney's Office and released on bail on or about February 23, 2022.

v. On or about February 17, 2022, CS-1 spoke to CC-1. CC-1 told CS-1, in substance and in part, that VAZQUEZ HILDAGO had a "family emergency," and that CS-1 should pay CC-1 for the fentanyl that CS-1 received on consignment.

w. On or about February 24, 2022, VAZQUEZ HILDAGO contacted CS-1 from a new phone number. VAZQUEZ HILDAGO identified himself to CS-1 as, in substance and in part, the husband of CC-1, *i.e.*, VAZQUEZ HILDAGO. In a phone call that same day, VAZQUEZ HILDAGO told CS-1, in substance and in part, that he had changed his phone number because too many people had it, but he expected to be able to complete the previously discussed transaction for ten kilograms of fentanyl in the coming days.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of WILSSON RAFAEL VAZQUEZ HILDAGO, the defendant, and that she be arrested, and imprisoned or bailed, as the case may be.

/s authorized electronic signature
JOSEPH SCHLEE
Drug Enforcement Administration

Sworn to before me this
7th day of March, 2022

HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK